IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEENA L. HORNER, et al | : | CIVIL ACTION NO.: 1:14-cv-00639 |
| | : | |
| Plaintiffs, | : | |
| | : | (Jones, J.) |
| v. | : | (Saporito, M.J.) |
| | : | |
| JOSEPH D. CUMMINGS, et al | : | |
| | : | |
| Defendants. | : | |

**FILED**
**WILKES BARRE**
JUL 2 9 2015

Per _____ ms

## MEMORANDUM
July 29, 2015

Presently pending before the court in this products liability action
are a motion to compel discovery (Doc. 67) filed by the plaintiff and a
motion to enforce protective order (Doc. 68) filed by the defendant,
Daimler Trucks of North America, LLC ("DTNA").[1]

## I.    Factual Background:

This matter concerns a fatal vehicle collision that occurred on May
10, 2012 at approximately 11:30 a.m.  Plaintiff's decedent, Michael A.
Horner was killed in the collision.  The plaintiff is Deena L. Horner, the

_____

[1] This matter was assigned to the undersigned U.S. Magistrate
Judge on April 1, 2015 for the purpose of resolving this discovery
dispute. (Doc. 52).

decedent's wife and administratrix of his estate. The plaintiff's amended complaint (Doc. 16) alleges the following: the decedent was a front-seat passenger in a Freightliner Columbia tractor trailer (the "Freightliner Truck") that was traveling southbound on S.R. 0072 in Swatara Township, Lebanon County, Pennsylvania. The defendant Cummings, the operator of a Chevrolet Equinox (the "Chevrolet"), was driving north on S.R. 0072 when the Chevrolet veered across the double yellow centerline and entered the southbound lane, striking the left front of the Freightliner Truck. The impact caused the fuel tank and/or fuel lines located on the driver's side of the Freightliner Truck to rupture, spilling diesel fuel, which then erupted into flames near the cab of the Freightliner Truck. As a result of the impact, the Freightliner Truck was caused to rotate counter-clockwise.

Before the collision, the defendant Collins, an employee of defendant Collins Trucking, Inc. was driving a Mack series concrete truck full of concrete in a southbound direction on the same road directly behind the Freightliner Truck. Immediately after the initial collision between the Chevrolet and the Freightliner Truck, Collins' concrete truck collided into the Freightliner Truck (Doc. 16).

The plaintiff claims that defendants, Cummings, Collins and Collins Trucking were negligent. Her claims against DTNA and Freightliner sound in strict liability and negligence. The thrust of the plaintiff's claims state that DTNA is strictly liable to the plaintiff include DTNA's failure to design and manufacture the fuel tanks and fuel lines so as to avoid rupturing and/or leaking fuel following a collision; failure to locate fuel tanks and fuel lines to avoid rupturing following a collision; failure to use shields, bladders and other devices to provide protection of fuel tanks and fuel lines; and failure to use fire suppression systems to prevent fires following ruptures of the fuel tanks (Doc. 16 ¶39). In addition, the plaintiff maintains that DTNA was aware of deaths resulting from post-collision fires with its semi-trucks due to rupture of fuel tanks and/or fuel lines before 2007. (*Id.* ¶44). In her motion papers, the plaintiff further defines the nature of the alleged defect in the design of the side saddle fuel tanks, i.e. fuel tanks that are located outside the frame rails, and as such, they are vulnerable to puncture and breach during ordinary and expected use on the highway. (Doc. 69, at 6).

The parties have engaged in discovery. The plaintiff filed her motion to compel answers to plaintiff's interrogatories and responses to request

for production of documents (Doc. 67). DTNA filed a motion to enforce the protective order. (Doc. 68). On the plaintiff's motion to compel, we have narrowed the issues to three for our consideration. First, we must decide whether the plaintiff is entitled to discovery related to alterative fuel designs in other types of vehicles manufactured and sold by DTNA. Second, we are asked to determine whether the plaintiff is entitled to accident history information not only for the tractor trailer in question, the 2007 Freightliner CL-120 Class 8, but also for all tractors that are equipped with side saddle fuel tanks. Finally, we are asked to consider the plaintiff's request for cost information per vehicle of the side saddle tanks and the mounting devices/hardware. (Doc. 85).

On DTNA's motion to enforce protective order (Doc. 68), we are asked to issue an order holding that DTNA's disputed materials were properly designated and are subject to the protections set forth in the stipulated protective order. (Doc. 37).

The issues have been briefed and oral argument was held before the court on July 8, 2015. This matter is now ripe for decision.

4

II.   Legal Standard.

The proper scope of discovery is set forth in Rule 26 of the Federal

Rules of Civil Procedure, which provides that:

> Parties may obtain discovery regarding any
> nonprivileged matter that is relevant to any party's
> claim or defense—including the existence, description,
> nature, custody, condition, and location of any
> documents or other tangible things and the identity and
> location of persons who know of any discoverable
> matter. . . . Relevant information need not be
> admissible at the trial if the discovery appears
> reasonably calculated to lead to the discovery of
> admissible evidence.

Fed. R. Civ. P. 26(b)(1).

As this Court has previously stated:

> Rule 26 establishes a liberal discovery policy. Discovery
> is generally permitted of any items that are relevant or
> may lead to the discovery of relevant information.
> Moreover, discovery need not be confined to items of
> admissible evidence but may encompass that which
> appears reasonably calculated to lead to the discovery
> of admissible evidence.

*Clemens v. N.Y. Cent. Mut. Fire Ins. Co.*, 300 F.R.D. 225, 226 (M.D. Pa.

2014) (citations omitted).

When the Court is presented with a motion to compel discovery,

> [t]he burden is on the objecting party to demonstrate in specific terms why a discovery request is improper. The party objecting to discovery must show that the requested materials do not fall within the broad scope of relevance or else are of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure.

*Id.* at 227 (citations, internal quotation marks, and alteration omitted).

Finally, any assessment of a discovery dispute must consider the substantive legal issues that give shape to the boundaries of relevance in a particular case, both at trial and in discovery. The amended complaint in this action asserts strict products liability and negligence claims against DTNA. Under Pennsylvania law,

> In a strict products liability action, a plaintiff must show that . . . (1) [the] product was defective, (2) the defect proximately caused the plaintiff's injury, and (3) the defect existed at the time the product left the defendant's control. To prevail in a negligence action, a plaintiff must plead and prove that the (1) defendant owed a duty of care (2) the breach of which (3) caused (4) damages. Under either theory, the threshold question is whether the product is in a defective condition. . . . [A] plaintiff may prove that a product is in a defective condition by showing either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer (consumer expectations test), or (2) a reasonable person would conclude that the probability and seriousness of harm caused by the

product outweighs the burden or costs of taking
precautions (risk-utility test).

*Nathan v. Techtronic Indus. N. Am., Inc.*, __ F. Supp. 3d ___, 2015 WL

679150, at *3–*4 (M.D. Pa. Feb. 17, 2015) (citations omitted); *see also*

*DeJesus v. Knight Indus. & Assocs., Inc.*, 599 Fed App'x 454, 455 (3d Cir.

2015); *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 335 (Pa. 2014).

III.   DISCUSSION

A. Other Vehicle Models

The bulk of the disputed discovery requests concern information or

documents related to alternative fuel system designs utilized by DTNA in

other types of vehicles it manufactures and sells. These vehicles fall into

the following categories: (a) commercial tractor-trailer truck models

beyond the subject truck, the 2007 Freightliner CL-120 Class 8 tractor; (b)

tractor-trailer trucks designed and manufactured for United States

military use; (c) the Freightliner "Revolution" concept truck; (d) trucks

powered by compressed natural gas ("CNG") and liquefied natural gas

("LNG"); and (e) other trucks, such as school buses, ambulances, and step

vans. The plaintiff seeks broad disclosure of information and documents

regarding fuel systems design by DTNA in these vehicle categories. DTNA

has contended that discovery should be permitted only into the specific truck model involved in the accident at issue, a 2007 Freightliner CL-120 Class 8 tractor.

> In product liability actions it is frequently difficult to judge which of a manufacturer's products are sufficiently similar to the allegedly defective product to be subject to discovery. Generally, different models of a product will be relevant if they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation. . . . On the other hand, where there has been no suggestion that the other models share pertinent characteristics with the products at issue, discovery relating to those models will be disallowed.

*Fine v. Facet Aerospace Prods. Co.*, 133 F.R.D. 439, 441–42 (S.D.N.Y. 1990).

The accident at issue in this case was a three-vehicle crash, which occurred when a passenger vehicle crossed the center line and collided with a tractor-trailer in which the plaintiff's decedent was a passenger. The collision breached the tractor-trailer's fuel system and caused it to ignite. The tractor-trailer was then struck from behind by a concrete truck. The plaintiff's decedent died as a result of the fire.

"To determine the scope of discoverable information under Rule 26(b)(1), the Court looks initially to the pleadings." *Trask v. Olin Corp.*, 298 F.R.D. 244, 263 (W.D. Pa. 2014). The amended complaint alleges, in pertinent part, that:

> 38.   The Freightliner Truck, as sold by [Daimler Trucks], and as used on May 10, 2012, was in a defective condition, unreasonably dangerous to Michael A. Horner.
>
> 39.   The defective conditions of the Freightliner Truck were, among other things, location of fuel tanks and fuel lines which made them vulnerable to rupturing following collision on the highway; failure to design and manufacture the fuel tanks and fuel lines so [as to] avoid rupturing and/or leaking following a collision; failure to use shields, bladders and other devices to provide protection of fuel tanks and fuel lines; failure to use fire suppression systems to prevent fires following ruptures of the fuel tanks; and such further defects as the evidence may show.

(Doc. 16, at 6).

The amended complaint further alleges that DTNA was negligent in breaching its alleged duties to:

> a. Exercise care in the planning, design, manufacture, assembly, testing and inspection of the above described truck and its components and systems[;]

b. Exercise care in the planning, design, manufacture, assembly, testing and inspection of the truck's fuel tanks, fuel lines, engine compartment and all related components on the truck[;]

c. Be aware of previous post crash fires involving their trucks and design their product to eliminate post-crash deaths due to fire[;]

d. Be aware of the state of the art concerning the protection of fuel systems in vehicles[;]

e. Adopt measures designed to avoid post-crash fires in their trucks[;]

f. Employ the knowledge they gained in contracting with United States' government agencies to manufacture commercial trucks able to withstand foreseeable highway conditions[;]

g. Exercise care in warning customers that the fuel systems on their trucks were unprotected and alerting them that for occupant safety, they should use aftermarket fuel system safety devices that [Daimler Trucks] did not provide[; and]

h. Perform puncture, tear and crash tests to evaluate fuel systems failure modes and develop methods to prevent those failures.

(*Id.* at 7–8).

The motion papers further clarify the nature of the alleged defect:

The design of the side saddle fuel tank is defective. They are located outside of the frame rails and, as such, they are vulnerable to puncture and breach during

10

> ordinary and expected use on the roadways. This presents a significant fire hazard. They are not protected by a barrier system, cage, or other materials to prevent puncture.

(Doc. 69, at 6). Generally, the plaintiff seeks discovery with respect to alternative fuel system designs that locate the fuel tank and/or fuel lines *inside* a truck's frame rails, designs that use armor, shields, or bladders to protect the fuel tank and its contents from rupture and ignition, and designs that incorporate fire suppression systems to prevent fires in the event of a fuel tank rupture.

"[A] plaintiff who raises a design defect claim is entitled to broader discovery than, for example, if the claim were solely one of negligent manufacture." *Fine*, 133 F.R.D. at 442. But a design-defect plaintiff must nevertheless adduce some evidence that the design for which discovery is sought is a viable alternative to the allegedly defective design. *Id.* at 443.

In support of the motion to compel, the plaintiff has provided an expert affidavit by engineer Erin M. Shipp. (Doc. 86-1). The Shipp affidavit describes in great detail the specific design features that make all commercially available semi tractor-trailer trucks, including the 2007 Freightliner CL-120 Class 8 tractor at issue in this case, substantially

similar in their fuel system design, at least in the context of this litigation.

As the Shipp affidavit states:

> 5.   The Freightliner Columbia 120 semi [tractor-trailer] truck has two exposed aluminum containers which serve as diesel fuel tanks. They are mounted on the outside of the frame rails and are located on the driver's side and passenger's side. This configuration is substantially similar to other semi [tractor-trailer] trucks, also known as "class 8" trucks.
>
> . . . .
>
> 9.   The design and location of the side-saddle fuel tanks in the heavy trucks are substantially the same during the past 50 years, although fuel tanks have changed from a bottom draw to a top draw to eliminate fuel lines from hanging at the lowest part of the truck, and the size in diameter of the tanks has become slightly smaller, little else has changed.
>
> . . . .
>
> 37.   All semi [tractor-trailer] trucks, with the exception of the Revolution and U.S. Army Trucks, have fuel tanks which are designed and located in substantially the same way for the past 50 years.
>
> 38.   All [Daimler Trucks] trucks are produced with two aluminum fuel tanks mounted on the outside of frame rails, leaving them vulnerable to breach by contact with other vehicles or objects. Regardless of the diameter or location on the outside of the rails, they are not protected by the frame rails, guards, or fire suppression systems. . . .

(Doc. 86-1, at 2–3, 8–9). Under these circumstances, the many other models of class 8 tractor-trailer trucks designed and produced by Daimler Trucks for commercial use are substantially similar to the 2007 Freightliner CL-120 Class 8 tractor, and thus fuel system design and accident data with respect to these other tractor-trailer models is clearly discoverable. *See Uitts v. Gen. Motors Corp.*, 58 F.R.D. 450, 452 (E.D. Pa. 1972) (citing *Prashker v. Beech Aircraft Corp.*, 258 F.2d 602 (3d Cir. 1958)); *cf. Trask*, 298 F.R.D. at 265 (noting that "substantial similarity" of product models is a question of admissibility rather than discoverability).

Although the military-grade tractor-trailer trucks designed and manufactured by Daimler Trucks under contract with the United States government employ different fuel system designs, they incorporate the very design features that the plaintiff contends Daimler Trucks should have employed in the subject tractor as an alternative to the traditional, allegedly unreasonably dangerous, unprotected side-saddle fuel system. These military-grade tractor-trailers serve the same essential purpose as the allegedly defective commercial-grade tractor-trailers—the long

13

distance movement of cargo (*see* Doc. 67-13, at 6–11; Doc. 86-5, at 2), and discovery into their design process and features is reasonably calculated to lead to admissible evidence of viable alternative fuel system designs. (*See* Doc. 86-1, at 6–8 (discussing fuel-system design features of military-grade trucks)).

Similarly, the Revolution concept truck incorporates, in a class 8 tractor-trailer truck, the very design features identified by the plaintiff as alternatives to the allegedly defective fuel system, showcasing technological innovations intended, among other things, to improve fuel efficiency and safety. Whether the design features incorporated into the Revolution concept truck were indeed commercially feasible at the time of the sale of the subject truck appears to be matter of ultimate fact that must be deferred to a jury. But discovery into the design process and features of the Revolution concept truck is reasonably calculated to lead to admissible evidence of potentially viable alternative fuel system designs. (*See* Doc. 86-1, at 5–6 (discussing the Revolution concept truck and the technical feasibility of placing fuel tanks between the frame rails)).

The Shipp affidavit does not, however, support a finding that the remaining categories present viable alternatives to the allegedly defective design. *See Fine*, 133 F.R.D. at 443. The Shipp affidavit fails to address CNG or LNG fuel systems at all, and it only mentions ambulances, school buses, and other light trucks in expressly acknowledging that "it is difficult to know if such designs could be incorporated in tractor trailers." (Doc. 86-1, at 10). The only evidence on record is two affidavits by defense experts describing, in persuasive detail, why these trucks and their fuel systems are fundamentally dissimilar from the long-haul tractor-trailer truck at issue in this case. (*See* Doc. 76-2, at 8–10; Doc. 76-3, at 5–8). Moreover, these categories of vehicles are all manifestly different from the subject tractor-trailer truck, inasmuch as all are designed for limited-range, local use only, not long-haul cargo transportation. *See generally Prashker*, 258 F.2d at 608 (upholding denial of discovery into fuel systems of dissimilar models of airplane); *Fine*, 133 F.R.D. at 443 (denying discovery into alternative fuel system designs in absence of expert affidavit as to viability).

15

Accordingly, the Court will **OVERRULE** the relevance objections by DTNA with respect to discovery concerning (a) commercial tractor-trailer truck models beyond the subject truck, the 2007 Freightliner CL-120 Class 8 tractor, (b) tractor-trailer trucks designed and manufactured for United States military use, and (c) the Freightliner "Revolution" concept truck, but the Court will **SUSTAIN** the relevance objections by DTNA with respect to all discovery concerning: (d) trucks powered by compressed natural gas and liquefied natural gas, and (e) all other types of truck, including school buses, ambulances, and step vans.

B.    Discovery of Post-Crash Accidents.

The plaintiff has served interrogatories and request for production of documents upon DTNA relating to accident history of post-crash fuel fed fires for its Class 8 tractors with side-saddle fuel tanks. Similar to its response to the paper discovery relating to DTNA's other vehicle models, DTNA has contended that discovery of post-crash accident information should be permitted only with respect to the specific truck model involved in the accident at issue, a 2007 Freightliner CL-120 Class 8 Tractor. The determination of whether the plaintiff is entitled to the

requested discovery for the post-crash accident information is governed by the "substantial similarity" rule discussed above.   Accordingly, our analysis is the same.  With respect to the accident history of post-crash fuel-fed fires regarding not only the tractor trailer in question but also for similar vehicles, the Shipp affidavit addresses the issue of similarity.  She refers to a 1995 study conducted by the University of Michigan Transportation Research Institute ("UMTRI") which found that about nine persons per month died from fires in Freightliner trucks from 1991 to 1993. (Doc. 86-1 ¶8).   Further, Shipp references the 1985 report by UMTRI entitled "An In-Depth Study of Truck Fire Accident Data."  Shipp maintains that the report is well known and respected in the trucking industry which states that "fires are associated with tractor trailers involved in fatal accidents in more than 5% percent of the cases compared with about 2.5% for passenger cars." (Doc. 86-1 ¶42).  In addition, Shipp states that of the 214 trucks involved in the study, the cause of fatal injury to truck occupants was attributed to fuel-fed fires alone in 20 of the 214 burned vehicles.  In another 53 cases, fuel fed fire was reported as a contributing factor in an occupant fatality. (Doc. 86-1 ¶44).

DTNA has attempted to limit the plaintiff's discovery to the subject truck, the 2007 Freightliner CL-120 Class 8 tractor. However, a party should not be limited by its opponent's theory of the case in determining what is discoverable. *Trask*, 298 F.R.D. at 265. (citing *In re Cooper Tire and Rubber Co.*, 568 F.3d 1180, 1192 (10th Cir. 2009). It appears that DTNA's arguments against relevance focuses on the substantial similarity rule going to the admissibility of these records at trial. "Rule 26(b) makes clear that discoverability and admissibility are distinct concepts, and a party may obtain discovery regarding any matter, not privileged, that is relevant to a claim or defense." *Trask*, 298 F.R.D. at 265; *see also*, *Scaturro v. Warren & Sweat MFG. Co., Inc.*, 160 F.R.D. 44, 46 (M.D. Pa. 1995). Thus, we find no reason to limit the plaintiff's discovery solely to claims and cases involving the subject truck, the 2007 Freightliner CL-120 Class 8 tractor. We find that post-crash accident information is relevant with respect to those allegedly defective commercial-grade tractor trailers, and discovery of the post-crash accident information is reasonably calculated to lead to admissible evidence. However, our inquiry does not end there.

As we have found that the plaintiff's discovery of claims and cases involving post accident history is not limited to the subject truck, we must also decide the length of time in which the plaintiff may reasonably inquire. The plaintiff has, in its paper discovery, requested various documents and information regarding accident history dating back to as early as 1960. The plaintiff has made requests for other information dating back to 1977 and 1988. During oral argument, counsel for the plaintiff acknowledged that there was no basis upon which to claim that any one of those years had any special relevance. As guidance for the determination of the reasonable time frame within which plaintiff may inquire about post-crash accident information, we return to the Shipp affidavit. There, Shipp states that "[f]or an engineer to know whether a vehicle design is safe, he or she must know the accident history of that design." (Doc. 86-1 ¶39). In support of her affidavit, Shipp references the 1985 and 1995 UMTRI studies referenced above, and a 1989 United States Department of Transportation publication entitled "Heavy Truck Fuel System Safety Study." Thus, we find it reasonable that plaintiff is entitled to discovery of post-crash accident investigation from 1985

19

through 2007. (Doc. 86-1 ¶¶8,13, 42).

The final issue for our consideration regarding the plaintiff's motion to compel is her request for cost-information per vehicle of the side-saddle tanks and the mounting devices/hardware. (Doc. 85).  Here, the plaintiff has requested that DTNA produce documents which set forth the cost of the following components to the subject tractor: (i) left side-saddle tank; (ii) right side-saddle tank; and (iii) various supports/braces/mounts which are used to affix the side- saddle tanks to the subject tractor.  In addition, the plaintiff has requested that DTNA provide documents which set forth costs per vehicle of providing dual aluminum fuel cylinders with carbon shells protected by a crash barrier and road-debris shield on the 2015 Freightliner MT 45 and MT 55 diesel walk-in vans. (Doc. 85 at 5).

In *Tincher*, the Pennsylvania Supreme Court held that [i]n Pennsylvania, the cause in strict products liability requires proof, in the alternative either of the ordinary consumer's expectations or of the risk-utility of a product." 104 A.3d at 401.  The court, further observed that

> in placing a product on the market, the manufacturer acts to design (and manufacturer) the product and, along with other distributors, to sell the product, including making the product attractive for sale by making implicit

20

representations of the product's safety. . . . a manufacturer in designing the product, engages in a risk-utility calculus; the policy-driven *post hoc* risk utility calculus necessary to determine whether the design choice thus made may justly require compensation for injury explains the relevance of that standard of proof in strict liability. Meanwhile, a seller of the product—whether the manufacturer or the supplier in the chain of distribution—implicitly represents by placing a product on the market that the product is not in a defective condition unreasonably dangerous.

*Id.* at 402-403 (citations omitted).

Therefore, guided by the pronouncement of the law as set forth in *Tincher*, we hold that the plaintiff is entitled to receive cost-information per vehicle on the side-saddle tanks and the mounting devices/hardware not only for the tractor trailer in issue, but also, similar tractor trailers. In light of our ruling that walk-in vans are not substantially similar to the design of the subject tractor-trailer, the plaintiff is not entitled to documents which set forth costs per vehicle of providing dual aluminum fuel cylinders with carbon shells protected by a crash barrier and road debris shield on the 2015 Freightliner MT 45 and MT 55.

D.   Stipulated Protective Order.

The parties entered into a stipulation for the entry of a protective order on July 1, 2014. (Doc. 37). The Court signed and entered the stipulated order on the same day. (Doc. 38). In its motion to enforce protective order, DTNA asks that we enter an order enforcing DTNA's designation of certain documents as confidential pursuant to the stipulated protective order in this case. DTNA maintains that the plaintiff's discovery demands require the production of thousands of pages of information concerning DTNA's sensitive and confidential business information related to the designs of components used in DTNA's products. The stipulated protective order provides that either party may designate materials produced in discovery as "subject to the protective order" if the materials contained, among other things, "competitively sensitive information, confidential business information or other private personal identifying or financial information, the disclosure of which would be detrimental to that party or to persons to whom the party owes the duty of confidentiality." (Doc. 38 ¶1). In addition, materials designated as subject to the protective order may not "be used by any

recipient of such information, or disclosed to anyone, for any purpose other than in connection with this lawsuit." (*Id.* ¶3). The disputed materials consist primarily of engineering drawings with respect to various components of the subject tractor-trailer and internal memoranda concerning fuel system design and testing. In support of DTNA's position that all of the materials contained competitively sensitive, confidential business information, DTNA has submitted the affidavit of Charles "Rocky" Blakewood. (Doc. 68-5).

Blakewood, an executive engineer for safety systems compliance and regulatory affairs for DTNA, stated that he reviewed all of the engineering documents of the components of the subject tractor-trailer. (Doc. 68-5, at 3). He further stated that DTNA will not release its designs to third-parties unless they agree to maintain confidentiality. (*Id.*). The disclosure of these documents to a competitor would likely result in competitive harm to DTNA. (*Id.*). Competitors would be more likely to engage in "the process of reverse engineering." (*Id.* at 4). This would enable DTNA's competitors to identify technical advantages in DTNA's designs. (*Id.*). The fact that certain drawings are older than others does

not detract from their value. (*Id.*).  The design retains its value with respect to the market for replacement parts and provides DTNA with a basis for new design innovations. (*Id.* at 5).  In addition, Blakewood examined DTNA's documents consisting of internal memoranda concerning fuel system design along with certain documents related to the testing of DTNA's fuel systems pursuant to Federal Motor Carrier Safety Regulation 393.67 ("Liquid Fuel Tanks"). (*Id.* at 5). Blakewood maintains that these documents contain fundamental information underlying the design of DTNA's fuel systems, including ideas that were considered but not implemented. (*Id.* at 6). The materials concerning DTNA's fuel system testing methods are also valuable because they provide a road map to the methods that DTNA has developed to ensure compliance with federal regulations concerning fuel systems design. (*Id.*).  Blakewood maintains that disclosure of this information would allow competitors to free-ride on the testing protocols that DTNA has developed;  in some cases, it has adopted testing protocols that exceed the testing that is required under federal regulations. (*Id.*).  Finally, Blakewood maintains that if this information were made public, it would reveal and negate DTNA's

competitive advantages in these areas. (*Id.*)

In deciding the issue before us, we are guided by the following rules. There exists, in both criminal and civil cases, a common law public right of access to judicial proceedings and records. (*In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001). The Third Circuit has stated that "[t]he public's exercise of its common law access right in civil cases promotes public confidence in the judicial system by enhancing testimonial trustworthiness and the quality of justice dispensed by the court." *Littlejohn v. BIC Corp.*, 851 F.2d 673, 678 (3d Cir. 1988).

Discovery, however, is usually conducted by the parties in private, outside of the public's view. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984); *cf. Leucadia, Inc. v. Applied Extrusions Techs., Inc.*, 998 F.2d 157, 165 (3d Cir. 1993) ("[T]here is a presumptive [common law] right to public access to all material filed in connection with non discovery pretrial matters, . . . . but no such right as to discovery motions and their supporting documents."). A party seeking a protective order over discovery materials must demonstrate that "good cause" exists for the protection of that material. Fed. R. Civ. P. 26(c); *Pansy v. Borough of*

*Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994); *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995). "Good cause" is established when it is specifically demonstrated that disclosure will cause a clearly defined and serious injury. *Pansy*, 23 F.3d at 786; *Glenmede Trust Co.*, 56 F.3d at 483.

Here, DTNA designated the subject documents confidential and under the purview of the stipulated protective order. Although, DTNA moved to enforce the protective order, it still has the burden to show good cause for continuing the order as to these documents.[2] A party seeking confidentiality "has the burden of showing that there is good cause for it." *Shingara v. Skiles,* 420 F.3d 301, 306 (3d Cir. 2005). Thus, DTNA bears the burden of establishing "good cause" to protect the umbrella of confidentiality established by the stipulated protective order. *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1122 (3d Cir. 1986) ("[R]ule 26(c) places the burden of persuasion on the parties seeking the protective

---

[2] The plaintiff objected to the confidentiality designation of the groups of documents under review. When the parties were unable to resolve the issue without court intervention, DTNA filed the instant motion.

order.").[3] In evaluating whether "good cause" exists, *Pansy* recognized the following factors, which are neither mandatory nor exhaustive:

(1)   whether the   disclosure will violate any privacy interests;

(2)   whether the information is being sought for a legitimate purpose or for an improper purpose;

(3)   whether the disclosure of the information will cause the party embarrassment;

(4)   whether confidentiality is being sought over information important to public health and safety;

(5)   whether the sharing of information among litigants will promote fairness and efficiency;

(6)   whether a party benefitting from the order of confidentiality is a public entity or official; and

(7)   whether the case involves issues important to the public.

23 F.3d at 787-91; *Glenmede Trust Co.*, 56 F.3d at 483.

In *Glenmede Trust Co.*, the Third Circuit instructs that the

---

[3] DTNA argues that the plaintiff failed to provide an affidavit from her or an expert explaining why the documents should not be kept confidential. (Doc. 87 at 3). The burden remains on the party seeking protection and the opposing party need not offer affidavits to support the challenge. *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 529 (1st Cir. 1993).

district court is best situated to determine what factors are relevant to the dispute and that the analysis should always reflect a balancing of private versus public interests. 56 F.3d at 483. Although the motion before us is titled a motion to enforce a protective order, if we deny the motion, we will in effect modify the order. Thus, *Pansy* discussed how courts should analyze motions to modify or lift protective orders as follows:

> The appropriate approach in considering motions to modify a confidentiality order is to use the same balancing test that is used in determining whether to grant such orders in the first instance, with one difference: one of the factors the court should consider in determining whether to modify the order is the reliance by the original parties on the confidentiality order. The parties' reliance on an order, however should not be outcome determinative, and should only be one factor that a court considers when determining whether to modify an order of confidentiality.

*Pansy*, 23 F.3d at 790 (footnote omitted). In addition, the Third Circuit has further instructed that good cause must be shown by "articulat[ing] [a] specific, cognizable injury from th[e] dissemination." *Glenmede Trust Co.*, 56 F.3d at 484. "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." *Pansy*, 23 F.3d at 786 (internal quotation marks omitted).

Overall, in determining good cause, a court must weigh the injuries that disclosure may cause against the other party's or the public's interest in the information. *See id.* at 787-91.

We shall now weigh the applicable *Pansy* factors:[4]

### 1. Legitimate Purpose

The plaintiff's purpose for seeking the documents appear to be legitimate, i.e. to share the documents among litigants and potential litigants and to make the public aware of a potentially defective design. DTNA suggests that the plaintiff's motivation is her counsel's attempt to make the documents available to "the plaintiffs' bar." (Doc. 87 at 8-9). We find that the purpose appears to be the sharing of information of a potentially defective design. Whether the information is shared among members of the plaintiffs' bar should come as no surprise to DTNA as the need for such information to those similarly situated to the plaintiff is

---

[4] There is no suggestion that disclosure of this information would constitute embarrassment to any individual nor is there any suggestion that DTNA is a public entity. Also, neither party has identified any personal privacy interest that would be affected by the disclosure of the information. Therefore, we shall not discuss these factors as they are irrelevant to the instant controversy.

evident. Nevertheless, this factor is not determinative of our decision.

## 2.   Health and Safety v. DTNA's Interest

The plaintiff maintains that the requested documents concern matters of public interest and public safety. DTNA argues that all of the documents challenged by the plaintiff contain competitively sensitive and/or confidential business information, the disclosure of which would be harmful to DTNA. *Pansy* instructs that "[c]ircumstances weighing against confidentiality exist when confidentiality is being sought over information important to public health and safety." 23 F.3d at 787. Fed. R. Civ. P. 26(c)(1)(G) authorizes the court to order that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way. Documents numbered 002995-003046 include test results from an evaluation of puncture resistance of certain fuel tank materials dating back to 1988. Test results of this nature are important to operators of tractor-trailers as well as employers who may purchase used vehicles of this nature. This document exists in the public domain. *See* SAE Int'l Surface Vehicle Recommended Practice: Fuel Systems - Truck and Truck Tractors  (rev. Nov. 2006),

available at http://autoparts-standard.org/index/images/userfiles/media/ SAE%20J703-2006.pdf.

DTNA claims that disclosure will make the documents which allegedly contain confidential and sensitive business information available to its competitors. The disclosure of trade secrets is subject to the balancing of public and private interests. *Smith v. BIC Corp.*, 869 F.2d 194, 199 (3d Cir. 1989) ("As a general rule courts 'have not given trade secrets automatic and complete immunity against disclosure, but have in each case weighed their claim to privacy against the need for disclosure.'") (quoting Fed.R.Civ.P. 26(c) advisory committee notes (1970)). The Third Circuit has has defined trade secrets as follows:

> A trade secret consists of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*BIC Corp.*, 869 F.2d at 200.

In concluding whether certain information is a trade secret, we are guided by the following factors:

(1) the extent to which the information is known outside of the owner's business;

(2) the extent to which it is known by employees and others involved in the owner's business;

(3) the extent of measures taken by the owner to guard the secrecy of the information;

(4) the value of the information to the owner and to his competitor's;

(5) the amount of effort or money expended by the owner in developing the information; and

(6) the ease or difficulty with which the information could be acquired or duplicated by the others.

*SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1256 (3d Cir. 1985); *BIC Corp.*, 869 F.2d at 200. The Blakewood affidavit reflects that engineering drawings of the components of the CL-120 Model tractor, identified by Bates Nos. DTNA 000170-002366 are considered confidential, proprietary information. These drawings are released outside the DTNA's design department when it retains third party manufacturers to supply components for its designs but only after the third parties agree to maintain confidentiality over DTNA's designs. The materials are not released to dealers or repair shops. (Doc. 68-5 ¶¶ 6, 7). Further, Blakewood

maintains that if a competitor had access to DTNA's design specifications, the competitor would have a road map that would allow it to reverse engineer DTNA's products more quickly, cheaply, and accurately. The engineering drawings specify the exact materials, shape, and tolerances required for the subject components. Blakewood claims that a rival seller could easily manufacture parts to DTNA's exact specifications if those items were disclosed. (*Id.* ¶¶ 2,10,11).

The documents which consist of DTNA's internal memoranda concerning fuel system design contain fundamental information underlying the design of DTNA's fuel systems, including ideas that were considered but not implemented. (*Id.* ¶¶13-16). Furthermore, Blakewood states that the materials concerning DTNA's fuel system testing methods are valuable because they provide a road map to the methods that DTNA has developed to ensure compliance with federal regulations concerning fuel systems design. He claims that the disclosure of the procedures that must be followed when performing tests to ensure compliance with federal regulations would allow competitors to "free-ride" on testing protocols that DTNA has developed. If the information were made public, Blakewood

claims that public disclosure would reveal and negate DTNA's competitive advantages in these areas. (*Id.* ¶¶17, 18). Thus, we find that for purposes of this motion, DTNA has demonstrated the existence of trade secrets in light of these factors.

At this early stage in the litigation, the plaintiff is able to prosecute her claims within the parameters of the stipulated protective order. She is not prejudiced in any way with the use of the documents during depositions or at trial. Also, she can have them reviewed by her chosen expert witnesses so long as she communicates the compliance provisions of the protective order to such experts. In addition, the plaintiff is not prohibited or limited in prosecuting her case. She can continue to engage in discovery and eventually try the case. We caution DTNA however, that as the case proceeds and more filings occur, the public's disclosure of relevant information may override DTNA's alleged trade secret protection.

DTNA has supported its assertion that the documents contain confidential and sensitive business information through the Blakewood affidavit. Also, Blakewood has defined the potential loss if disclosure is made at this time.

3.   Promote Fairness and Efficiency

DTNA maintains that the order should be enforced because there has not yet been a determination that the design in question is, in fact, defective.   DTNA has designated a 1988 fuel tank puncture test as confidential despite the report's existence in the public domain.  It would not be fair to the plaintiff to allow a confidentiality designation on documents that are already in the public domain. Therefore, documents of DTNA that are already in the public domain shall no longer be deemed subject to the stipulated protective order.  We use this 1988 test by way of example and not as exclusivity.

DTNA argues that the plaintiff's[5] motivation for the request to de-designate the documents as confidential is for the benefit of "the plaintiffs' bar." (Doc. 87 at 8-9).   Further, DTNA maintains that we should not consider the alleged interest of the "plaintiffs' bar." (*Id.*). The Third Circuit has instructed that "[f]ederal courts should not provide a shield to potential

---

[5] DTNA questions whether the plaintiff is actually aware of the pending motion and the concern is that of her counsel. Despite DTNA's supposition, we shall address the matter and the motion as an issue between the litigants and not their counsel.

claims by entering broad protective orders that prevent public disclosure of relevant information." *Glenmede Trust Co.*, 56 F.3d at 485.

The sharing of relevant information among current and potential litigants is a factor that weighs in favor of the plaintiff. In *Glenmede Trust Co.*, the court held that "[t]he sharing of information among current and <u>potential</u> <u>litigants</u> is furthered by open proceedings." 56 F.3d at 485 (emphasis added); (see also *Pansy,* 23 F.3d at 787 "Circumstances weighing against confidentiality exist when confidentiality is being sought over information important to public health and safety, and when the sharing of information among litigants would promote fairness and efficiency (citation omitted).

4.    <u>Issues Important to the Public</u>

The case involves issues important to the public. It is important to the public that the vehicles that use the nation's highways be safe. *Pansy* emphasized that a court always must consider the public interest when deciding whether to impose a protective order. *See* 23 F.3d at 785. "[I]f a case involves private litigants, and concerns matters of little legitimate public interest, that should be a factor weighing in favor of

granting or maintaining an order of confidentiality." *Id.* at 788. Safe travel upon the nation's highways, roads, and thoroughfares by all vehicles, especially larger vehicles, can hardly be deemed a matter of little legitimate public interest. This factor weighs against maintaining the protective order.

### 5.   Reliance

Neither party addressed this factor.  However, the court assumes that both parties reasonably relied upon the court's approval of the stipulated protective order.  The stipulation was agreed to upon mutual consent and signed by counsel for all parties.   This case contains a potentially large amount of discovery.  A blanket protective order such as the subject order is not unusual in cases where large amounts of discovery is contemplated. *Cipollone*, 785 F.2d at 1122.  A review of the stipulated protective order demonstrates that the parties anticipated that from time to time a party may request that specific documents be removed from the Order's protection. (Doc. 37 ¶7).  The motion before the court is within the contemplation of the stipulation.  At most, this factor is neutral to both parties as the stipulation was entered into mutually and contemplated that the parties may disagree from time to time as to a confidentiality

37

designation.

After weighing the applicable *Pansy* factors, we find that at this early stage of the litigation, the stipulated protective order should continue to be enforced. However, as the matter progresses and more filings are made, the parties are free to revisit the issue. Thus, we will grant DTNA's motion in part without prejudice to the plaintiff to object to some or all of the documents as the case proceeds. We will deny DTNA's motion as it pertains to documents designated confidential that are already in the public domain.

An appropriate order will be entered.

JOSEPH F. SAPORITO, JR.
United States Magistrate Judge

Date: July 29, 2015

38